FARMERS' LOAN & TRUST CO. v. BOWERS (two cases).

Nos. 101, 102.

Circuit Court of Appeals, Second Circuit.

Jan. 8, 1934.

George Z. Medalie and Thomas E. Dewey, U. S. Attys., both of New York City (Samuel C. Coleman, Frank Chambers, Ralph E. Stone, and Ira Koenig, Asst. U. S. Attys., all of New York City, William Stanley, Asst. to Atty. Gen., and Carlton Fox, Sp. Asst. to Atty. Gen., of counsel), for appellant.

Taylor, Blanc, Capron & Marsh, of New York City (John W. Davis, Carl Taylor, Charles Angulo, and Russell L. Bradford, all of New York City, of counsel), for appellees.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

These actions, tried together before a court without a jury, will be considered in one opinion. The actions are by the trustee under two deeds of trust made by William Waldorf Astor, in his lifetime, to recover from the appellant the estate taxes paid to appellant as a result of the inclusion of the corpus of the trusts in the estate of Astor after his death. The tax was levied on two irrevocable trusts of realty in the United States, executed August 15, 1919, by Astor, a British subject and resident, who died October 18, 1919, at the age of 71 years. The property consisted of all the donor's realty in the United States, with the exception of certain cemetery lots. Each trust deed conveyed an undivided half of the settlor's real estate in trust, to pay the settlor a tax free annuity of $150,000 for life out of the income, or the corpus if necessary, the remaining income to a named son for life; then the corpus to be distributed to the named son's issue as the son shall appoint by will or in default of such payment in equal shares per stirpes.

The settlor's property consisted of a large fortune inherited from his father. Before 1916 he had made gifts to his children outright or in trust in excess of $24,000,000 in addition to some very valuable English property. On May 25, 1916, he created a trust of personalty of over $23,000,000 for his children which was under consideration by us in Farmers' Loan & Trust Co. v. Bowers, 29 F.(2d) 14. After this grant the bulk of his remaining property in the United States consisted of real property. On January 3, 1917, he executed a will of all his property in the United States in which he left the residuary estate in trust, the income of one-half to be paid to each son for life, the corpus to be distributed as they by will shall appoint and in default of appointment to their issue per stirpes.

The trust deeds of August 15, 1919, disposed of $46,000,000 of real estate, which was about all of the residuary estate under the 1917 will, in like manner as the will did with the exception of the annuity reserved to the settlor. On September 16, 1919, the settlor executed a very short will in which he bequeathed $50,000 to employees, repeating provisions of the 1917 will, and giving the remainder of his property in the United States to his son John Jacob absolutely. Under this will the net estate of $1,191,336.02, consisting of mortgages, notes, cash, insurance, and miscellaneous property, was administered. By an English will, executed January 3, 1917, the decedent disposed of £400,000 worth of English property, principally art collections. He disposed of an Italian villa by an Italian will.

The executor of the American will paid an estate tax of $70,633.60 on the claimed net estate of $1,191,336.02. The Commissioner assessed an additional tax of $15,961,321.34 adjusted to $15,769,069.86, which was paid under protest. In Farmers' Loan & Trust Co. v. Bowers (C. C. A.) 29 F.(2d) 14, that portion paid with respect to the 1916 trust of personalty was recovered. The trustee in the present actions, involving the 1919 trusts, seeks to recover $10,810,857.98 assessed against the realty which passed under these trusts.

The statute imposing the tax (Revenue Act of 1918, § 402, 40 Stat. 1097) provides:

"Sec. 402. That the value of the gross es-

tate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—\* \* \*

"(c) To the extent of any interest therein of which the decedent has at any time made a transfer, or with respect to which he has at any time created a trust, in contemplation of or intended to take effect in possession or enjoyment at or after his death (whether such transfer or trust is made or created before or after the passage of this Act), except in case of a bona fide sale for a fair consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such a consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this title."

█ Since the transfers were made within two years before the death of the donor, the burden rested upon the appellee to establish that such transfers were not made in contemplation of death.

The settlor was very much concerned and disturbed about the heavy taxes which war expenditures made necessary. He was in constant communication with his British solicitor, Barchard, and his American lawyer, Peabody, concerning taxes and the creation of a trust, much of which is set forth in correspondence between Peabody and Barchard. On October 3, 1915, Astor wrote a letter to Peabody in which he commented upon the English taxes on a foreign income and stated: "I see no remedy except if my life is prolonged a few years, & if John survives the war to make an important assignment of real estate in equal portions to him and to Waldorf."

A proposal in the House of Commons to force owners of foreign securities to surrender them to the Exchequer prompted a letter of October 8, 1915, from Astor to Peabody, suggesting the assignment of all Astor's stocks and bonds in the United States. This was accomplished by the trust of 1916, which anticipated the British government's compulsory surrender move early in 1917, and successfully avoided appropriation of his American securities. The correspondence of 1917, of Astor, Peabody, and Barchard, discussed United States income taxes of 1916 and the War Revenue Act of 1917 and the problem of double taxation of income. Peabody wrote to Astor, November 26, 1917, suggesting a policy disposing of property in the United States and reinvestment in England to avoid double income taxation. In a letter of December 28, 1917, to Peabody, Astor disposed of Peabody's suggested policy by calling attention to the British death duties and discussed the great advantage that New York realty is not subject to such duties. However, it was not until 1918 that the donor and his solicitor gave attention expressly to the disposition of his real estate in the United States. After an interview with Astor, Barchard, on May 16, 1918, disclosed Astor's plan in writing to Peabody. He wrote: "Your client has been discussing with us the present position and future prospects of his real estate. His idea is to anticipate the provision of his Will, to some extent, by transferring the property to the Trustee Company upon trust to pay him a fixed proportion of, or sum out of, the income and the balance of the income to his sons in equal shares, without any accumulation."

On June 13, 1918, Peabody wrote to Barchard a letter which was forwarded to Astor and read in part:

"I have received your letter of May 16th, and have given full consideration to the subject of the same and conferred on two occasions with the solicitors of the Trustee Company.

"Answering the questions contained in your letter, in order, my view is as follows:

"1. *The advisability of any such arrangement generally.* The main advantages that I see in connection with the matter have their origin in the heavy burden now placed upon the large estates by reason of the abnormal income tax and the high rates which now exist in the case of what we call the transfer tax, which arises on the transfer of the property by way of devise or inheritance. We can, no doubt, expect these high rates of taxation to exist for a considerable time, and indeed I think no one expects rates ever to return to the old basis of a few years ago. This Country, entirely aside from the war, has entered upon a system under which a substantial part of its expenses is to be met by income and inheritance taxes, rather than by the system of a high protective tariff, through which, a few years ago, a large part of its National income was raised. It would follow from this that the direct taxes upon property and the tax through incomes and inheritance are not simply war measures, but are likely to last indefinitely in the future. If a trust, such as you describe, were made for the life of the grantor and the grantor should reserve to himself a certain share of the income, or a certain round sum per annum, and the balance of income were to be divided be-

tween his two sons. it would, undoubtedly, make a substantial decrease in the amount of Income Tax that is to be paid, because each one would pay the tax upon his own income and the rate would, therefore, not rise to the high rate to which the tax on the aggregate income would rise if it were treated as the income of one alone.

"The same principle would be applied to the question of the transfer tax, and indeed I am inclined to think that a trust might be created in such form that the transfer tax might be almost wholly, if not wholly, saved. In the case of a gift inter vivos there would be no transfer tax imposed, and although there is a section of the law which imposes such a tax in case of a gift made in contemplation or anticipation of death, yet if the grantor survives the gift two or more years the presumption would be under the law that such a gift was not in contemplation or anticipation of death."

This letter clearly emphasizes the estate tax as at least one of the determining factors which led the settlor to make his 1919 trusts.

On September 16, 1918, Barchard wrote to Astor about the proposed trusts and stated that he had been considering, among other special topics, the application of the British death taxes and the effect upon Astor's American will. Astor answered the next day that he had always understood that British estate duties did not apply to his realty in the United States and that he supposed that the settlement would cancel his American will since it would leave him nothing of which he could dispose. He had in mind estate taxes, for he wrote: "British Death Duty would not be levied on the Settlement of 1916, since two and a half years have elapsed since the American Securities passed out of my ownership." On the same day Barchard wrote to Peabody stating that Peabody's letter of June 13, 1918, quoted at length, had been considered and that Astor desired a settlement to be prepared. Barchard pointed out that, to avoid British death duties, the trust must be drawn so as not to work an equitable conversion of the realty. He urged the reservation of some power of revocation or alteration. Peabody answered Barchard, by letter of October 7, 1918, in which he said that a bill was pending in Congress which was certain to increase "taxes and estate duties," and he concluded by saying that he would write again in a few days. He did write to Barchard discussing a draft of the settlement which was sent to Barchard November 7, 1918. On December 3, 1918, Barchard wrote to Astor quoting from Peabody's letter:

"Mr. Peabody has inserted a power of revocation in the Settlement, but he writes about it as follows:

" 'Now as to the result to be accomplished: On the basis of the new tax bill now pending in Congress and estimating the rents of the coming year as nearly as we are able to, there would appear to be a saving in income tax of about $55,000 per annum. Under the Estate or death duties, if everything follows as we would wish, there would necessarily be a very large saving, amounting to several million dollars. On the other hand, there is of course, a possibility of the father outliving the one or both of the sons, in which case there would be a substantial loss in the plan, I am very doubtful about the ultimate escape from death duties at any rate, particularly if the reservations as to revocation and control are left in the settlement and I understand it is deemed essential that they should be. If it is ultimately successful, it would be at the end of prolonged litigation. It is a case that would surely be contested by the Government and it would excite a great deal of attention and, as I see it, every presumption and every doubt would be decided against us. I should not myself attach much value to the probability of ultimately making a substantial saving on this point.'

"This is not altogether clear. In one sentence ('if everything follows as we would wish') he forecasts a saving of several million dollars in death duties. In the next sentence but one he is 'very doubtful about the ultimate escape from death duties.'

"I think that the two questions, namely the amount of the annuity and the power of revocation, must depend largely upon what is the main object of the settlement. If it is to economize in American Income Tax and death duties, I should attach great importance to Mr. Peabody's advice to dispense with the power of revocation. But if it is for another object and the death duties and income taxes are not regarded as of paramount importance I am all in favour of a power of revocation. Against American measures of confiscation I should imagine no Settlement would prevail, though it is just conceivable that some advantage might be derived from the property being vested in an American Corporation instead of in aliens. Against English measures of confiscation the fact of the property being in America is probably its best defense.

"By confiscation I mean expropriation rather than taxation.

"As regards your Will, Mr. Peabody's inclination is to leave it alone, leaving a large

part of it to be simply inoperative. It seems to me however that that would be dangerous, and it will at all events become necessary to consider the source from which the legacies which you have bequeathed by your American Will can be paid. Furthermore, you may wish to reduce the legacies to the Executors, whose tasks should be largely reduced by the two Settlements."

While it is true that the portion of the letter quoted gives consideration to both sides of the question of the probability of saving the United States estate taxes, yet both Peabody and Barchard took the view that an irrevocable trust offered the better chance of avoiding estate taxes. As finally drawn, the trusts were irrevocable. Barchard wrote to Peabody, on December 27, 1918, discussing the annuity proposed and stating that in deference to Peabody's opinion, Astor was willing to dispense with the power of revocation. This indicated a desire on the part of Astor, on Peabody's advice, to save estate taxes. Referring to Astor's will, Barchard wrote to Peabody, December 27, 1918: *"In Relation to the Will.* The Settlor does not view with favor the idea of leaving a Will a large part of which would become inoperative by reason of the Settlement. He thinks it might cast suspicion on the Settlement and weaken its position." In answer Peabody wrote, on January 22, 1919, discussing the probable United States income tax on the realty, on the question of the amount of the annuity and continued with a rejection of the plan of intestacy. He pointed out the desirability of having a named executor rather than some unnamed administrator and referred to the necessity of security for the administrator and the expense attached thereto, and said: "In an ordinary case one of his sons or both of them would be first entitled to be so appointed. In this case, by reason of the fact that they are not citizens or residents of New York they would be disqualified. In a general way the next one in this case would be the next of kin coming nearest in relationship. They are all, more or less, remote and we might find ourselves with a stranger appointed to deal with such questions as I have suggested. In fact, the duty of resisting the claim which will be made for estate and transfer taxes would involve the appointment of an executor or administrator and notwithstanding any plan of settlement which is carried out, I think we must expect in some form to confront that question sooner or later. If the main property is passed by these settlements of real and personal estate to Trustees, a very simple short

will, giving all the testator's property to his sons or to his children and an executor named for the purpose of carrying out that will, will be all that is needed, but I think it would add to the dangers of the situation to leave any point of the situation out of control." Barchard sent a copy of this letter to Astor, who acknowledged it, stating that his health was poor and that he was going to be absent in France for several months.

On March 1, 1919, the settlor contracted a severe cold in France and was under the daily care of a physician until March 20, but was considered cured on May 7, 1919. At the serious stage of his sickness, the doctor told him he was not in danger of death and he determined not to trouble with certain documents he would wish to see if he were in danger of death. It might safely be found that he did not expect death from that illness.

On May 13, 1919, Barchard cabled Peabody that Astor proposed to execute a power of attorney to Peabody for execution of the trusts and requested that a draft of the American will be sent to England for Astor's signature. In preparation for the execution of the power of attorney, on May 21, 1919, Barchard wrote Astor, on May 20, explaining the contents of the settlement in final form, saying in part: "These Settlements reproduce the disposition of the real estate contained in your Will, but subject to the payment to you of an annuity of three hundred thousand dollars ($150,000 under each deed) over and above all income taxes and super tax, and free of all expenses and deductions. The annuity is to commence from the date of the Settlement and is to be paid quarterly, or as you may from time to time direct. If the income of the real estate should be insufficient to meet the annuity—which Mr. Peabody does not anticipate will be the case—it will be a charge on the capital of the estate."

The settlor's physician said that when Astor returned from France in May, 1919, he was "quite a wreck. He was much thinner and his diabetes had returned. He was some better in the summer but never entirely got back to his strength." On June 15, 1919, the same physician called in another, as consultant, but they did not think the settlor was near his death, although his convalescence was tardy. On June 25, 1919, Barchard sent Peabody a draft of the trust settlement with final changes but cabled on July 9 that execution should await execution of the American will. On August 7 Astor wrote Peabody:

"We have reached Midsummer & I am thinking of the disposition to be made of next

winter. If circumstances favour I shall probably spend November in Paris & the next two months at Nice. My wretched health has somewhat improved but recovery at my age is slow after so serious an illness as I had last winter.

"I am very glad the transfer to the Trust Co. has been completed & hope that matters at the office will continue as smoothly as heretofore."

His American will was executed September 16, 1919, and he died a month later of a gastric hemorrhage.

From the record, including the correspondence which passed between the English solicitor and the American attorney at Astor's direction, it is clear that the parties concluded that these irrevocable trusts, reserving an annuity for the settlor's life, and disposing of practically all of his real property in the United States, would take the place of his American will of 1917. Combining these inter vivos gifts and the American will of 1919, we have practically the same disposition as the 1917 will. The settlor was concerned and thoroughly conversant with the problems of taxation of every kind in so far as they affected his property. He sought and obtained this information. He was also concerned with the British death duties and was trying to avoid as much taxation as possible. When the 1919 trusts were being planned in 1918, Barchard, after a conference with Astor, wrote on May 16, 1918, that his client's idea was to anticipate his will by the creation of a trust and asked for a plan. The reply to this letter discusses the possible savings in both estate and income taxes and was forwarded to the settlor, with the comment of the American lawyer, suggesting that such a scheme would reduce taxation. The letter of December 27, 1918, from Barchard to Peabody, stated what seems to have been the settlor's personal view as to the manner of making a will and shows a full knowledge of the situation. It reveals knowledge of the tax problems and that both income and estate taxes were being considered. It does not permit the inference that Astor was not considering in a substantial, serious, and knowing manner, the effect of the estate taxes.

While the trusts were being considered, he had a serious illness, and while thereafter his health was neither good nor bad, he was an old man. He died suddenly; a kind of death to be expected at his age.

The District Court thought that the rule of United States v. Wells, 283 U. S. 102, 51 S. Ct. 446, 75 L. Ed. 867, justified the recovery, substantially holding that there could not be two controlling motives and that he was bound to select from the motives of Astor and find the controlling motive. The court concluded that not estate tax but the saving of income tax was the controlling motive for these settlements. He rejected the claim that the settlor was actuated by the desire to give his sons responsibility and emphasized that he was seeking to obtain greater income in the form of an annuity. The court depended principally upon the Appellee's Exhibits 151 and 152, setting forth an analysis of the claimed saving of income tax and the increase of income through the settlements.

The revenue acts, from that of 1916 to that of 1932, have had similar provisions imposing estate taxes. The purpose of the provisions is to tax all transfers which are testamentary in fact even though not so in form. Without such a provision, administration of the estate tax would be greatly impeded. The present trusts, reserving an interest to the settlor for life, are not the type intended to take effect in possession or enjoyment on or after his death. McCormick v. Burnet, 283 U. S. 784, 51 S. Ct. 343, 75 L. Ed. 1413; Morsman v. Burnet, 283 U. S. 783, 51 S. Ct. 343, 75 L. Ed. 1412; Burnet v. Northern Trust Co., 283 U. S. 782, 51 S. Ct. 342, 75 L. Ed. 1412; May v. Heiner, 281 U. S. 238, 50 S. Ct. 286, 74 L. Ed. 826, 67 A. L. R. 1244; Reinecke v. No. Trust Co., 278 U. S. 339, 49 S. Ct. 123, 73 L. Ed. 410.

█ The question therefore is whether or not the settlor created these trusts in contemplation of his death. The phrase "in contemplation of death," as used in section 402 (c), was considered in United States v. Wells, 283 U. S. 102, 51 S. Ct. 446, 75 L. Ed. 867, where the court said that a construction of this phrase by the court below to mean a reasonable fear that death was near at hand when the transfer was made was too narrow. While affirming the decision of the Court of Claims [39 F.(2d) 998], the Supreme Court carefully reviewed the facts there involved, holding that upon a broader view of the words "contemplation of death" the settlor there did not make his transfer in such contemplation. The court said at page 116 of 283 U. S., 51 S. Ct. 446, 451:

"The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. Nichols v. Coolidge, 274 U. S. 531, 542, 47 S. Ct. 710, 71 L. Ed. 1184, 52 A. L. R. 1081; Milliken v. United States, 283 U. S. 15, 51 S. Ct. 324, 75 L. Ed. 809. As the transfer

may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be 'contemplated,' that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body and mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bounty, the evidence of the existence or nonexistence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. The natural and reasonable inference which may be drawn from the fact that but a short period intervenes between the transfer and death is recognized by the statutory provision creating a presumption in the case of gifts within two years prior to death. But this presumption, by the statute before us, is expressly stated to be a rebuttable one, and the mere fact that death ensues even shortly after the gift does not determine absolutely that it is in contemplation of death. The question, necessarily, is as to the state of mind of the donor.

"As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is 'near at hand.'

"If it is the thought of death, as a controlling motive prompting the disposition of property, that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. * * *

"It is apparent that there can be no precise delimitation of the transactions embraced within the conception of transfers in 'contemplation of death,' as there can be none in relation to fraud, undue influence, due process of law, or other familiar legal concepts which are applicable to many varying circumstances. There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus give effect to the manifest purpose of the statute."

It is now fully determined that it was the intention of Congress, by section 402 (c), 40 Stat. 1097, to prevent, as far as possible, the evasion of the estate taxes by making transfers which, like this one, are attempted substitutes for testamentary disposition. Nichols v. Coolidge, 274 U. S. 531, 542, 47 S. Ct. 710, 71 L. Ed. 1184, 52 A. L. R. 1081; Milliken v. United States, 283 U. S. 15, 51 S. Ct. 324, 75 L. Ed. 809; United States v. Wells, supra; Heiner v. Donnan, 285 U. S. 312, 52 S. Ct. 358, 76 L. Ed. 772.

The correspondence referred to clearly demonstrates that the settlor had both classes of taxes, income and estate taxes, in mind in making his disposition of this very large fortune. Indeed, with all the effort put forth, his legal advisors were very doubtful about the ultimate escape from estate taxes. Peabody wrote: " * * * I am very doubtful about the ultimate escape from death duties at any rate, particularly if the reservations as to revocation and control are left in the settlement and I understand it is deemed essential that they should be. If it is ultimately successful, it would be at the end of prolonged litigation. It is a case that would surely be contested by the Government and it would excite a great deal of attention and, as I see it, every presumption and every doubt would be decided against us. I should not myself attach much value to the probability of ultimately making a substantial saving on this point." And in the letter of Barchard to Peabody of December 27, 1918, he stated that the settlor did not favor Peabody's suggestion that the American will of 1917 be left to stand and that the settlor thought "it might cast suspicion on the settlement and weaken its position" and that the settlor was "inclined to die intestate in regard to American property altogether—leaving the personal property to devolve under the Settlement of May 16 and the real property under the now intended Settlement." Thus it will be seen that the settlor and his advisors worked out an all inclusive plan to provide

for the devolution of all his property at his death, making careful provision for the avoidance of the estate taxes and at the same time making adequate provision to insure, as far as possible, a successful resistance of an anticipated claim of the government therefor. A very substantial inducing motive for making the transfer in question was the avoidance of the estate taxes and the settlor was of the mind at the time of really disposing of his property with the same testamentary result as he did in his American will of 1917. As a matter of fact, it might well be said that he made this transfer in contemplation of death within the meaning of section 402 (c). In Milliken v. United States, supra, the court states the rule as follows at page 23 of 283 U. S., 51 S. Ct. 324, 327: "It is sufficient for present purposes that such gifts are motivated by the same considerations as lead to testamentary dispositions of property, and made as substitutes for such dispositions without awaiting death, when transfers by will or inheritance become effective. Underlying the present statute is the policy of taxing such gifts equally with testamentary dispositions, for which they may be substituted, and the prevention of the evasion of estate taxes by gifts made before, but in contemplation of, death. It is thus an enactment in aid of, and an integral part of, the legislative scheme of taxation of transfers at death."

▪ Statutory provisions intended to prevent the evasion of the general purposes of the statute ought to be fairly and reasonably construed so as to carry out their purposes. Taylor v. United States, 3 How. 197, 11 L. Ed. 559; United States v. A. Graf Distilling Co., 208 U. S. 198, 28 S. Ct. 264, 52 L. Ed. 452. The rule is specifically applicable to statutes providing for the taxation of transfers in contemplation of death. In re Fulham's Estate, 96 Vt. 308, 119 A. 433.

There were two or more motives for transfer established, each of which substantially induced the making of the gift, and since it is impossible to determine any one single dominating, controlling, or impelling motive, the taxpayer has failed in sustaining the burden of proof. Where the donor makes a gift to accomplish some purpose to be effective during his lifetime and at the same time to accomplish a purpose to be effective at his death, each one of which substantially induces the transfer and is part of the inducing element going into making the gift, each of the motives becomes an inducing, actuating, and determining cause. Therefore each is controlling and each is compelling.

In such case section 402 (c) is applicable, for the intent or motive to evade the tax is present. It is the presence of that state of mind, as an inducing motive, and not the superior weight or strength of another concurring motive, that brings the transfer within the taxing statute. Indeed, it might be thought that the aggregate weight of concurring motives controls the action of the settlor, but with the burden on the taxpayer it cannot arbitrarily require a separation and weighing of the motives for to do so would lead to an artificial result. It would be disregarding the actualities of the situation. Where we know the settlor planned to set up a substitute for his previous testamentary disposition and he did so with the avowed purpose of avoiding the incidents of estate tax, to attempt to apply a test other than that of the statute would result in a defeat of the purpose of the statute. The alleged superiority of the motive to save income tax over the motive to save estate tax cannot be established merely by the contention that the former existed and was the actuating motive when the same proof establishes that the other existed and was also an actuating motive. Nor is it sufficient to say that superiority is established by the fact that income tax was the first to be complained of or that it was spoken of more often in the letters which passed between the settlor and his solicitor and his American attorney. The quality of the motive is not thus to be ascertained, but by the actual effect which is ultimately had upon the settlor in making the transfers.

Peabody, in his letter of June 13, 1918, where he answered Barchard's inquiry made in behalf of the settlor as to the plan proposed of disposing of the real estate in the United States, said: "The main advantages that I see in connection with the matter have their origin in the heavy burden now placed upon the large estates by reason of the abnormal income tax and the high rates which now exist in the case of what we call the transfer tax, which arises on the transfer of the property by way of devise or inheritance." These were the advantages sought by the settlor in this transfer.

It is very clear to us that Astor did not have merely a donative interest or intent in making these settlements. In the case of such a gift inter vivos, specific motives, such as generosity or a desire to see children independent, are present and sufficient to actuate the donor. To characterize a gift as such, it is not necessary that there be any reference to contemplation of continued life. Indeed,

the donor may not think about continued life but may assume it. But the purpose to be accomplished must be shown to be one desirable to the donor with continued life. It may be a desire to be relieved of management of property in order to have more leisure time or opportunity for other pursuits which would be definitely associated with an act of contemplation of continued life. · But in the case of a testamentary disposition, including gifts in contemplation of death, the psychological or mental state of one disposing of property is entirely different from that of one making an inter vivos gift. The same specific motives of generosity or a desire to see children independent may be present, but in addition there is present a definite and positive state of mind contemplating death. It is that state of mind which is inseparable from acts of testamentary disposition. That contemplation to some extent constitutes a specific motive of the transfer. Other specific motives, such as a testamentary scheme to save the estate tax may be present and, unlike the usual motives of generosity or protection of dependents, point strongly to the presence of the motive of contemplation of death not completely expressed.

To successfully overcome the statutory presumption the taxpayer must show that death was not contemplated by proving that continued life was actually contemplated in connection with the settlement or that a specific motive definitely or at least commonly associated with contemplated continued life was present and actuated the settlement. The last was clearly established in the Wells Case and prevailed. But where, as here, the proof establishes no such single motive but discloses more than one motive as substantially present, acting concurrently and motivating the gift, one of which might point toward a gift inter vivos and the other a testamentary· disposition, as income tax and estate tax, there is no basis upon which the trial court could choose income taxes or capital levy as dominant, and disregard the estate taxes which equally and as substantially were considered by and motivated the settlor and his advisers. Where the motive associated with the contemplation of death appears equally or substantially with the motives associated with contemplated continued life, nothing that was said in the Wells Case offers a rule for choice of a dominant motive. It is in just such a case as this, if death follows the material transfer within two years, that the presumption set up by the statute properly operates and the taxpayer must prove that the gift was not made in contemplation of death. The presumption of the statute can be overcome only by proof that the motive relied upon was on the facts associated with continued life and not equally with testamentary disposition or by proof that the motive relied upon so motivated the donor that any other motive associated with testamentary disposition, which might be present, was merely an incident and not also a substantial motive for the settlement.

When the Wells Case said that the motive to escape estate taxes must predominate, it was in a situation where the settlor's other motive was to provide for his children, not to escape income taxes. That in our opinion should color the language. The gift at bar was in fact made in contemplation of death, for it was a substitute for a will; the settlor had his death in mind, and so contemplated it, when he made the settlement. He was actuated only by a desire to escape taxes, income and estate. It would not have been "in contemplation of death," as the statute means it, if his predominant motive was of the class dealt with in the Wells Case. But it was not, his only motive other than his desire to escape estate taxes was to escape income taxes; and though it was not unlawful to do that, so much of his purpose was certainly not affirmatively commendable. The law does not actively foster such a purpose; it regards it in a different light from providing for children, developing their financial responsibility, or enjoying leisure in old age. Such purposes may well exempt a settlement made de facto in contemplation of death; may keep it from being de jure such; they do so because the law recognizes them among those purposes which should be affirmatively encouraged, and sufficient as an excuse when they preponderate. But a purpose to avoid income taxes is not of that kind; it is excusable, but it cannot positively justify a gift otherwise taxable. We do not believe that the language in the Wells Case meant to say so, and for that reason it seems to us immaterial that on the evidence it was impossible to know whether the settlor was more concerned about his estate taxes or his income taxes.

The court erred in applying the rule of law applicable and in the conclusion reached below. Loetscher v. Burnet, 60 App. D. C. 38, 46 F.(2d) 835; Hodgkins v. Com'r, 44 F.(2d) 43 (C. C. A. 7); Flannery v. Willcuts, 25 F.(2d) 951 (C. C. A. 8).

Judgments reversed.