Estate of William C. Chapin, by Lincoln Rochester Trust Company, Executor v. Commissioner.
Estate of Chapin v. Commissioner
Docket No. 3340-66,
United States Tax Court
T.C. Memo 1970-7; 1970 Tax Ct. Memo LEXIS 351; 29 T.C.M. (CCH) 11; T.C.M. (RIA) 70007; January 12, 1970, Filed. Julian M. Fitch, 910 Union Trust Bldg., Rochester, N Y., for the petitioner. Ferdinand J. Lotz, III, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined a deficiency of $35,384.51 in the estate taxes of the Estate of William C. Chapin. Petitioner agreed to all of respondent's adjustments except the inclusion in the decedent's estate of $208,528.67 as proceeds from an insurance policy on the life of the decedent. Three issues are left for our determination. First, we must decide whether a premium payment covering the first year of the above policy was made by the decedent in contemplation of death. Second, we must decide whether the funds used for a premium payment covering the second year of the above policy should be attributed to the decedent. (If we resolve this question in the affirmative, we must also decide whether this payment was made in contemplation of death.) Finally, if we dispose of either issue one or the parenthetical in issue two in the affirmative, we must then decide whether the amount to be included in the decedent's gross estate under section 2035 [1] should be *353 the insurance proceeds brought about by the decedent's death or an amount equal to the premium payments referred to above. Findings of Fact Most of the facts are stipulated, and the stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner is the Lincoln Rochester Trust Company (sometimes hereinafter Lincoln) a banking corporation organized under the laws of the State of New York and having its principal office in Rochester, N. Y. Lincoln is the executor of the Estate of William C. Chapin and filed the estate tax return with the district director of internal revenue at Buffalo, N. Y.
The decedent, William C. Chapin (hereinafter sometimes William) was born on December 15, 1911. He married Janette K. Chapin (hereinafter sometimes Janette) on October 31, 1936, and a daughter and two sons were born of the marriage during 1938, 1941 and 1947, respectively. William and Janette were residents of Rochester at the time of his death. On May 22, 1962, William died of multiple injuries sustained in the crash of a commercial *354 airplane. The Massachusetts commercial airplane. The Massachusetts Mutual Life Insurance Company (hereinafter Massachusetts) paid Janette $208,528.27 as the proceeds from the policy in question on William's life. The Commissioner held that these proceeds were includable in William's gross estate under one or more of sections 2033, 2035, 2042 or 2043. William J. Lee (hereinafter Lee) was for many years a personal friend of the decedent. Lee was an insurance representative for Massachusetts. On two occasions during the early and middle nineteen-fifties, Lee had sold William life insurance policies with an aggregate face amount of $53,000. For a period of about 1 1/2 years prior to March 21, 1961 - the date on which the insurance policy in question was signed - Lee and William discussed the possibility 12 of adding to William's life insurance coverage. Their discussions were oriented to determining the type of coverage best suited to the then needs of the decedent and his wife. On several occasions during their many discussions, Lee and William addressed themselves to the question of who would take out the policy. William eventually decided that his wife, Janette, should do *355 so. Lee testified that William's reasons for this decision were twofold: (a) to minimize his estate tax; and (b) to protect Janette during her lifetime by making her the owner of a flexible policy. William had rejected the idea of having the corporation, over which he presided as president, purchase the insurance on his life because he felt the corporation (hereinafter referred to as Vanilla) needed to accumulate its available funds for the expansion of business. During these discussions, William apprised Lee of the fact that he (William) was indebted to the Lincoln Rochester Trust Company. William had borrowed the money constituting this indebtedness to invest in what William considered to be a speculative investment. The schedule below establishes the total amount borrowed by William and the dates on which the loans constituting this amount were obtained from Lincoln: Date
Amount
November 27, 1959
$ 10,000
February 16, 1960
10,000
March 14, 1960
30,000
May 25, 1960
17,000
August 16, 1960
25,000
August 26, 1960
15,000
December 14, 1960
59,000
April 12, 1962 26,000
Total
$192,000
The following shares of Eastman Kodak Company common stock, all *356 of which were registered in William's name, were pledged as collateral for the loans set forth above: Value Per
Share as
Stipulated
Date Pledged
Shares[Parties[Value
bt
Total
August 16, 1960
455
$121
$55,367
December 14, 1960
2,000
113
226,250
October 9, 1961
300
101
30,431
April 12, 1962
400
110
44,325
The estate tax return for William's estate listed as a debt of the decedent demand loans owed to Lincoln aggregating $189,768.86 plus interest. Of the 4,806 shares of Eastman Kodak common stock included in William's estate, approximately 3,100 shares secured this debt at the time of William's death. The discussions between William and Lee culminated in Janette's applying for a life insurance policy on the life of her husband in the principal amount of $200,000. The application was executed by Janette on March 21, 1961. On March 22, 1961, Massachusetts issued to Janette insurance policy No. 3615006 on the life of her husband. As owner and beneficiary of the policy, Janette was entitled to assign it, change the beneficiary, and borrow from the insurer at five percent interest using the policy as security. The policy *357 issued to Janette can be described as a normal or convertible life insurance policy with a higher rate of cash reserve value developing in the early years and leveling off to an ordinary rate in the later years. The following is a projection of the cash values of the policy commencing with the end of the first year when the insured was age 49: Year
Value
Year
Value
1
$ 3,438
11
$55,568
2
9,294
12
60,518
3
15,162
13
65,428
4
20,240
14
70,288
5
25,320
15
75,098
6
30,398
16
79,850
7
35,470
17
84,538
8
40,528
18
89,160
9
45,568
19
93,710
10
50,582
20
98,184 The policy also provided for income payments to the beneficiary beginning at age 65 of the insured and in the amount of $498 per month for 10 years certain. The annual premium on the policy was $7,834. William paid the first premium with funds which he borrowed from Massachusetts against the security of his other insurance policies. He did not file a gift tax return for 1961. The second premium was paid by Janette on March 22, 1962, two months before William's tragic death, by borrowing against the cash surrender value of the policy here in issue. Though the cash *358 surrender value at the beginning of the second policy year was only $3,438, by company practice the owner of a policy such as the one in issue is allowed to borrow at the beginning of a policy year an amount equal to 95 percent of the cash surrender value which would be established by payment of the premium for which the loan is being made. This practice 13 merely recognizes the fact that, given an insurance policy with a cash surrender value intact from the previous year, an owner is always free to pay the succeeding year's premium with his own funds and immediately thereafter borrow an amount equal to such premium from the cash surrender value thus established. Hence, in the case at bar, Janette was able to pay the second year's premium of $7,834 by borrowing against $9,294, the value placed on the cash surrender privilege at the end of the policy's second year. William would have paid the second premium had the necessary cash been available to him. Moreover, other than the cash surrender value of the policy, Janette had no means of her own at the time this second premium payment was made. Hence, the decision to borrow against the policy was in the nature of a temporary expedient *359 brought on by William's unfavorable cash position. Janette understood that William had urged her to take out the policy in order to provide her with means of her own while he was alive and to provide additional means in the event of his death. Janette amended the policy on May 22, 1961. By this amendment, she made her three children equal owners and beneficiaries in the event she predeceased William and they, or any of them, survived her. Janette's estate was named owner and beneficiary in the event they all predeceased William. As a consequence of Janette's applying for the insurance on William's life, William, then age 49, underwent two physical examinations conducted by two doctors designated by Massachusetts. Prior to this time William had not been to a physician for about three years. William was at the time of his death a very athletic person. He was an excellent amateur golfer with little or no handicap, and had won several trophies in invitational and club tournaments. Lee, who played golf with him many times, felt William was one of the better golfers in the Rochester area. Both Lee and Janette believed William enjoyed excellent health up to the time of his death. *360 William executed his last will and testament on March 10, 1961, eleven days before Janette applied for the policy on William's life. One of the alleged reasons for executing the will at this time was to provide for the disposition of a large block of Vanilla stock in which William had a remainder interest bequeathed to him under the will of a Mrs. Brown who died sometime in 1958. Decedent's will made Janette the primary beneficiary of his estate. Among William's concerns in 1961 was that a large portion of Vanilla's business was centered around a dozen customers, one of whom accounted for about one-third of Vanilla's business. Opinion On March 22, 1961, Massachusetts insurance policy No. 3615006 on the life of the decedent herein was issued to the decedent's wife, Janette. Decedent, who was 49 years of age on the date of issuance, enjoyed very good health up to the time of his death in the crash of a commercial airliner on May 22, 1962. The first premium on the policy was paid by the decedent in 1961. The second premium on the policy was paid by Janette on March 22, 1962, with funds obtained by borrowing against the cash surrender value of the policy. Our task in this case *361 is twofold: first, we must determine whether the premium payments described above were paid by or can be considered a transfer (payments) made by the decedent in contemplation of death; and second, if our answer to the above inquiry is wholly or partly in the affirmative, we must then decide the amount to be included in the decedent's gross estate under section 2035. [2] Issue 1 - Contemplation of Death Section 2035(b) creates a rebuttable presumption that all transfers of an interest in property made by a decedent within three years of death and for less than an adequate and full consideration in money or in money's worth are in contemplation of death. The burden of rebutting this presumption is on the petitioner. Reeves' Estate v. Commissioner, 180 F. v. Gidwitz' Estate, 196 F 2d 829 (C.A. 2, 1950). Long ago, the Supreme Court in United States v. Wells, 283 U.S. 102 (1931), established the rationale to be employed in construing the words *362 "in contemplation of death." In that case the Supreme Court stated: As the test, despite varying circumstances, is always to be found in motive, 14 it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. It is contemplation of death, not necessarily contemplation of imminent death, to which the statute refers. * * * The words "in contemplation of death" mean that the thought of death is the impelling cause of the transfer, and while the belief in the imminence of death may afford convincing evidence, the statute is not to be limited, and its purpose thwarted, by a rule of construction which in place of contemplation of death makes the final criterion to be an apprehension that death is "near at hand." In each case the central issue is one of fact: what was the impelling motive of the decedent when the transfer was made? Allen v. Trust Co., 326 U.S. 630 (1946). As stated by the Supreme Court in Commissioner v. Culbertson, 337 U.S. 733, 743 (1949): The Tax Court * * * must * * * [determine the intent with which a person acted] in every estate tax case in which it is contended *363 that a transfer was made in contemplation of death for "The question, necessarily, is as to the state of mind of the donor." * * * In arriving at this factual determination, the decedent's health at the time of the transfer is not conclusive, but merely evidence to be weighed in determining the decedent's motives. See, e.g., Commissioner v. Gidwitz' Estate 196 F. 2d 813, 816 (C.A. 7, 1952), affirming 14 T.C. 1263 (1950). On the one hand, the fact that he might be relatively young and healthy does not necessarily preclude a determination that a transfer is in contemplation of death. On the other hand, the fact that he might be elderly and experiencing poor health does not necessarily call for a determination that a transfer is in contemplation of death. All the facts and circumstances surrounding the transfer must be weighed to arrive at a determination. In the instant case we are faced with a factual pattern which involves the payment of premiums on a policy covering the life of the decedent. Addressing ourselves, for the moment, to the premium payment made by the decedent in 1961, it is incumbent upon us to note that while transfers relating to insurance *364 on the life of the donor-decedent may suggest a motive associated with death, the subject matter of the transfer is not determinative of the motive under which it was made. In each case, it is a circumstance to be considered and accorded a just degree of evidentiary weight. See, e.g., Estate of Edmund W. Mudge, 27 T.C. 188 (1956). In the case at bar, however, we believe that the premium payment made by the decedent was prompted by a motive associated with death. We first note that the insurance policy which generated this premium payment was issued to Janette, as owner and beneficiary, only 11 days after William executed his will, the dispositive provisions of which made Janette the primary beneficiary of William's estate. Though the timing of the two such events in other circumstances might be regarded as happenstance, we believe that the facts of this case militate against such a conclusion. The bulk of William's estate was, at the time he executed his will, made up of 4,806 shares of Eastman Kodak stock. As of December 14, 1960, 2,455 of these shares (with a stipulated value totaling $281,617) were pledged as security on William's indebtedness to the Lincoln Rochester *365 Trust Company. At the time of William's death, both the number of shares of Eastman Kodak stock pledged as security and the amount owed to Lincoln had increased. We believe these facts yield the inescapable conclusion that the short period of time which separated the execution of William's will and the issuance of the policy on his life was more than just coincidental and that, since Janette had no money of her own, William's impelling reason for paying the 1961 premium was to put into force a policy on his life, the proceeds of which could be used to free the pledged Eastman Kodak stock in the event of his death. In arriving at this conclusion, we are not unmindful of the fact that one of the reasons asserted for Williams' having executed the will at the time he did was to provide for the disposition of a large block of Vanilla stock in which he had a remainder interest bequeathed to him under the will of a Mrs. Brown. However, we also note that though Mrs. Brown died in 1958 and though her will was admitted to probate on May 14, 1959, decedent's will was not executed until March 10, 1961. We also note that both the execution of the will and the issuance of the insurance policy *366 on William's life came at the conclusion of a 1 1/2 year period during which William and Lee had devoted extensive discussions to William's insurance position as well as his debt situation. Cf. 15 Estate of Edwin W. Rickenberg., 11 T.C. 1 (1948). Nor do we find controlling Janette's testimony to the effect that William, while "interested in [the] death benefits of the policy," was "primarily interested in being able to provide me with something of my own. * * * I was aware of the cash value of the policy and that it was mine." If this were so, regular deposits in a savings account would have yielded a substantially larger means of security, during his lifetime, than the cash surrender value of the policy. Moreover, though the insurance policy in question did have an annuity feature, which was to commence when William attained the age of 65, there can be no doubt that a straight annuity contract would have better served this end. Additionally, we cannot overlook Lee's testimony in which he indicates that estate tax considerations, as well as thoughts of protecting Janette during William's lifetime, influenced William in having his wife take out the policy on *367 which the premium in question was paid. The desire to avoid estate tax clearly is a motive associated with death. Farmers' Loan & Trust Co. v. Bowers 68 F. 2d 916 (C.A. 2, 1934); McIntosh's Estate v. Commissioner, 248 F. 2d 181 (C.A. 2, 1957), affirming 25 T.C. 794 (1956); Vanderlip v. Commissioner, 155 F. 2d 152 (C.A. 2, 1946), certiorari denied 329 U.S. 728 (1946), affirming 3 T.C. 358 (1944). With this in mind the most we can say in petitioner's favor is that, though the decedent, in making the 1961 premium payment, may have considered Janette's security during his life, it has not been shown to us that this life-associated motive was more impelling than either his wish to (a) avoid estate tax or to (b) provide a means of freeing the aforementioned shares of Eastman Kodak stock in the event of his death. Under these circumstances, we are compelled to find that petitioner has failed to satisfy the burden required of him under section 2035. See Farmers' Loan & Trust Co. v. Bowers, supra, at 923, where it was said that the taxpayer fails in his burden of proof when he is unable to establish *368 which of two or more motives, each substantially inducing the transfer, was the "single dominating, controlling, or impelling motive"; and Estate of Arthur H. Hull, 38 T.C. 512, 527 (1962), reversed on other grounds 325 F. 2d 367 (C.A. 3, 1963). Issue 2 - Premium Payment from Cash Surrender Value Turning our attention to the second premium payment, the question which confronts us is whether the funds used for this payment should be attributed to the decedent. Only if we resolve this question in the affirmative will it be necessary for us to determine whether the payment was made in contemplation of death. With regard to this question, respondent admits that the funds used by Janette to make this payment were obtained by her by borrowing against the cash surrender value of the policy. Respondent also recognizes that she was able to do so only because company practice assigned a fictional value to the loan feature of the policy at the beginning of the second premium period. Nevertheless, respondent urges that the full amount of the second premium payment is attributable to the payment made by the decedent in the prior year. We disagree. We believe the *369 premium money transferred by William in 1961 constituted a completed gift at that time. What use Janette made of the gift thereafter is of no consequence to us. We think it well established that once a completed gift is made, any benefits which flow therefrom are to be deemed the property of the donee. See and compare Estate of Ralph Owen Howard, 9 T.C. 1192 (1947), where it was held that dividends received on a gift of stock, and thereafter deposited in a joint savings account with the donor, constituted property of the donee for purposes of the joint ownership provisions of what is now section 2040 of the Code. See also Swartz v. United States, 182 F. Supp. 540 (D. Mass. 1960), and First National Bank of Kansas City v. United States, 223 F. Supp. 963 (W.D. Mo. 1963), where, in similar circumstances, it was held that gain from the donee's sale of stock could not, for purposes of section 2040, be attributed to the donor even where the proceeds of such sale were used to acquire jointly held property with the donor. We believe the rationale of the cases cited above governs the question now before us. Though a donor's generosity may live on in *370 the estimation of the person benefitted by his bounty, it cannot be made to live on interminably for purposes of the tax law. In so holding, we explicitly reject respondent's assertion that the issue before us is controlled by our decision in Estate of Clarence H. Loeb, 29 T.C. 2216 (1957), affirmed, 261 F. 2d 232 (C.A. 2, 1958). In Loeb we were called upon to resolve an issue which arose under section 811(g) (2)(A) of the Internal Revenue Code of 1939 which provided, in part, that insurance proceeds on the life of the decedent, were includable in his gross estate if: purchased with premiums, or other consideration, paid directly or indirectly by the decedent, in proportion that the amount so paid by the decedent bears to the total premiums paid for the insurance * * * The specific question addressed to us in Loeb was whether (under the "premium payment test" of the above section) funds, which the decedent gave to his wife and which were used by her to make premium payments on a policy covering the life of the decedent, should be regarded as having been indirectly paid by the decedent. We held in the affirmative basing our *371 decision on our finding that the decedent had made the gifts of money in question with the intent that these sums would be used by his wife in payment of the contested premiums. Recently, in Estate of Inez G. Coleman, 52 T.C. 921 (1969), we stated that "[It] is clear from the legislative history that Congress sought to inter the 'premium payment' test [of section 811(g) with the ashes of the 1939 Code * * *." Since Loeb, though factually related to the case before us, arose under the "premium payment test" of section 811(g) (2)(A) of the 1939 Code, we hold that our decision in that case is totally inapposite to our determination of the issue at hand. Issue 3 - Amount Includable in Decedent's Estate Having determined that the 1962 premium cannot be attributed to the decedent for purposes of section 2035, the only question remaining is the amount to be included in the decedent's gross estate as a result of the 1961 premium paid by the decedent in contemplation of death. We hold that the amount to be included in the decedent's estate under section 2035 is $7,834 - the premium paid by William in 1961. In this regard, we are governed by our recent determination *372 in Estate of Inez G. Coleman, supra, wherein it was held that "the frontiers of section 2035 should not be extended to include the proceeds of life insurance simply because a decedent paid the premiums. Only the dollar amount of the premiums paid in contemplation of death is includable in the gross estate of the decedent * * *." Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise designated.↩
2. Consistent with our earlier characterization of the issues presented in this case, the discussion which follows will divide the questions for consideration into three separate issues. (See p. 2, supra.)↩