**OMAHA NAT. BANK v. O'MALLEY.**

Civ. No. 495.

District Court, D. Nebraska,
Omaha Division.

Oct. 29, 1946.

L. R. Newkirk, of Omaha, Neb., for plaintiff.

Douglas W. McGregor, Asst. Atty. Gen., Andrew D. Sharpe and Wm. B. Waldo, Sp. Assts. to the Atty. Gen., and Joseph T. Votava, U. S. Atty., and Thomas C. Quinlan, Asst. U. S. Atty., both of Omaha, Neb., for defendant.

DELEHANT, District Judge.

In the absence of any perceptible consideration suggesting its publication, this memorandum is prepared solely for the advice of counsel and with the intention that it will remain unreported. Accordingly, it will not be burdened with the purposeless narration of facts, or items of evidence, or copying of documents. The ultimate fact in issue has been resolved by the jury's verdict, and the written instruments involved in the case are within the certain and exact knowledge of counsel and the court.

(Despite the recital in the foregoing paragraph and the initial notation that the memorandum was "not to be reported", it has been cited in unofficial services. It is, therefore, being reported herewith.)

Stated very briefly, the action was brought by the plaintiff to recover from the defendant a sum of money paid unwillingly upon the assessment against the decedent's estate of a deficiency in respect of federal estate tax. The payment, inclusive of the then accrued interest on the determined deficiency, was made on December 19, 1940 in the sum of $18,446.72. Disregarding as trivial, two minor adjustments in items of the gross estate, the deficiency tax was fixed by including as taxable in the decedent's gross estate the value at her death of the assets of a trust, by her erected through a trust agreement under date of August 9, 1922. Repelling the contentions of the assessing authority,[1] the plaintiff alleged in its complaint, first, that the transfer in trust was not made in contemplation of death within the meaning of 26 U.S.C.A. Int.Rev.Code, § 811(c); and secondly, and with certain subsidiary averments that will presently be noted, that it was not intended to take effect in possession or enjoyment after the death of the settlor within the meaning of the same section of the statute. In his answer, the defendant stood upon the ground previously taken by the assessing authority and denied the position thus presented by the plaintiff in both of its phases.

The defendant demanded trial by jury of the issues in the case so triable. In a pretrial conference held under Rule 16 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, it was agreed that the single question to be submitted to a jury was whether the transfer in trust was made in contemplation of death. Trial was had upon that issue; and on May 23, 1946 the jury returned a verdict finding that the transfer was not made in contemplation of death. The verdict determines the submitted question favorably to the plaintiff, and with finality, subject, however, to the right of the defendant to assail the trial and the verdict for disabling error. And such an assault is made by two separate motions. They will be considered in the inverse order of their filing.

The defendant asks that the verdict be set aside and judgment entered in accordance with a motion for a directed verdict tendered by him at the close of the reception of evidence before the jury. In part, the motion for judgment upon the factual point is premised, both by express statement, and, through incorporation by

[1] It may be observed that the record discloses no specific or formal findings by the Revenue Agent in Charge or any other authority in behalf of the government. The plaintiff alleges—and it is nowhere specifically denied—that the only declaration of the commissioner's position is the statement in the so-called "thirty day letter" to the effect that the trust property was "included in the gross estate under the provisions of Sec. 302 (c) of the Revenue Act of 1926, as amended", being 26 U.S.C.A. Int.Rev. Code, § 811(c). That is taken by the court to be a sufficient, if not analytical, statement of a position in behalf of the tax assessing instrumentality, that the transfer in trust was made in contemplation of death, and that it was intended to take effect in possession or enjoyment at or after the death of the settlor, with the assertion of his right to stand on both or either of those grounds.

reference, upon the asserted grounds for a new trial hereinafter considered. Their discussion will not be anticipated at this point. To the extent that the motion for judgment rests upon the somewhat obliquely charged insufficiency of the evidence to support the plaintiff's contention upon the issue of the contemplation of death as the dominant motive for the transfer in trust, the short and simple answer is that it is not supported by the record of the testimony. There was much evidence from which the jury could reasonably have concluded—as it manifestly did—that the consideration of her own convenience during life rather than of the bestowal of her substance on her death controllingly motivated the settlor in the erection of the trust.[2] The court was persuaded to that effect upon the submission of the evidence; and is confirmed in that opinion by a present perusal of the transcript of the proceedings. The motion for the vacation of the verdict and the entry of judgment is overruled and denied.

In passing, it is to be noted that the plaintiff itself by motion for a directed verdict in its behalf squarely presented the contrary contention that the record was void of any evidence adequate to support a verdict in the defendant's behalf upon the contested point of fact. And it now vigorously presents that position. Upon the trial the court, despite a substantial doubt in the matter,[3] was of the opinion that the evidence warranted the jury's consideration of the defendant's factual claim. Beyond noting the plaintiff's persistence in its position, the court now expresses no conclusion upon it, for, in the view which the court takes of the motion for a new trial, decision upon it is unnecessary. If the court were persuaded of the validity of the challenge by the defendant to the court's charge to the jury, shortly to be discussed, it would re-examine the plaintiff's contention of inadequacy which would then become a material consideration.

■ The motion for a new trial contains assignments of the inadequacy of the evi-

[2] The court has observed the item of evidence most vigorously pressed upon it by the defendant. The settlor had been released from a legal guardianship only a few weeks before the execution of the Trust Agreement. The defendant professes to see in that circumstance a manifest indication of a death motive for the transfer. But the significance of the guardianship in its historical setting seems to be convincingly to the contrary. The guardianship had continued for many years; and it came into being and persisted entirely at her own request and for her own convenience, to relieve her of anxiety in and responsibility for, the management of her affairs, and to protect her against possible financial indiscretion. Originally, and until his death not long before the end of the guardianship, her brother was the guardian. When he died, his son, the settlor's nephew, succeeded him and acted for a short while. He and the settlor were not consistently congenial with each other, and mutually desired that he be discharged; and the guardianship was, therefore, closed. The erection of the trust so shortly thereafter clearly served, in respect of its assets, to afford the settlor the same relief from managerial responsibility which she had enjoyed under the guardianship. Both throughout the guardianship, and equally under the trust, she insisted upon her own consultation about the handling of the trust property, particularly in respect of investments. A circumstance confirmatory of the plaintiff's contention upon motive is her maintenance with the bank of another and separate trust, for her sole benefit during her life, out of which funds for her support were chiefly derived.

Nor is her entertainment for a long time, including 1922, of a somewhat irrational delusion of an irregularly religious character, or her voluntary dwelling in a hospital for the care and treatment of persons suffering from nervous and mental disorders for some years immediately prior to her death, but substantially after the erection of the trust, of significant import. It is unquestioned that she was at all those times a vigorous person of determined will and keen business acumen and judgment. No issue arises or could arise on her sanity. Moreover, she was not quite 69 years of age, in vigorous health, socially active, and boastfully hopeful of a long life when she made the transfer; and she continued to live for some 17 years thereafter.

[3] It must be observed that the direct testimony upon the issue of motive was produced entirely by the plaintiff. And it argues very earnestly that the reliance of the defendant in that branch of the case is not upon evidence or supportable inference, but rather upon mere suspicion.

dence to sustain the verdict, to which the court has already adverted, and assertions that the finding of the jury is contrary to law and that errors were committed in the trial generally, and in the reception of evidence, which are not supported by argument and are believed to be without foundation. But, principally, it is bottomed on that portion of the court's charge which was oriented to the jury's determination of the dominant motive for the transfer in trust[4] and on the refusal of the court to give an instruction tendered by the defendant upon the point.[5] The defendant contended up-

[4] The portion of the court's charge thus challenged is: "The law recognizes that, in many instances, the actions of people are not prompted by a single or simple consideration, but rather spring from more than one consideration, or from several concurring considerations. It may be so with the transfer of property by its owner. But it is your task in this case to determine what was the dominant motive of Margaret Scott Shackleford in making the transfer in trust that is in question. If you find from the evidence that she was prompted by only one motive, that finding will naturally control your verdict. But if you find from the evidence that she was concurrently influenced and prompted to her action by more than one motive, it will be your duty to ascertain and determine from the evidence which of those motives dominantly impelled her to make the transfer in trust. If that dominant motive was her contemplation of death, then your answer to the question submitted in your verdict will be 'yes', even though you may further find that she also entertained and contemplated one or more other, but not dominant, considerations involving purposes designed to be effective as a convenience or advantage to her during her life. However, your answer to that question will be 'no' if you find from all the evidence either that she did not make the transfer for a purpose springing from the contemplation of death, or that, though she may have reflected upon the consideration of death, her transfer was dominantly impelled by another consideration, or by other considerations involving purposes designed to serve her convenience or advantage during life, and would not but for those other considerations have been made. In the event that you find that two motives with equal persuasiveness dominantly impelled her to make the transfer, and one of them was the contemplation of death and the other a consideration or combination of considerations involving purposes designed to serve her convenience or advantage during life, then you will find that the transfer in question was made in contemplation of death, and will answer the question submitted to you by the word 'yes'." That language is to be understood in association with the following unchal-

lenged excerpt from the charge which immediately precedes the instruction to which exception is taken:

"The expression 'contemplation of death', in its presently operative context, does not mean that general expectation of death in which all men constantly live. It signifies a particular concern, giving rise to a definite motive. Neither does it mean a present fear that death is near at hand. It may, of course, arise in consequence of an apprehension of early death, but it may also exist and provide a real motive for a transfer of property, though the transferror be in good health and in no present apprehension of early death. It implies no more than that a property owner has become concerned in respect of the devolution or disposition of his property after his death and, prompted by that concern, has taken action to control it. The transfer activated by that motive is made 'in contemplation of death' whether or not death is believed to be close at hand. It is sufficient to support a conclusion that a transfer is made 'in contemplation of death' if the transferror's contemplation of death be the dominant cause or motive inducing the transfer, whether or not death is believed to be near.

"By the dominant motive for an act is meant the motive or consideration which controllingly inspires or impels the person acting to its commission.

"If the trust agreement here in question was motivated by the same considerations as lead persons to testamentary disposition of property, and made as a substitute for such disposition without awaiting death, when transfers by will or inheritance become effective, then it was a transfer in contemplation of death within the meaning of the statute."

[5] The tendered instruction upon the question is: "If it appears from the evidence that the decedent made the gifts in question to accomplish some purpose to be effective during her lifetime and at the same time to accomplish a purpose to be effective at her death, each one of which substantially induced the transfer and was part of the inducing element going into making the gifts, then I charge you that each of the motives becomes an inducing actuating and determining cause. Therefore, each is controlling and each

on the trial, and now insists, to borrow from the language of counsel's exception, "that even though a life motive existed, if there was also a death motive, and not dominant, it would yet require the answer "yes" to the question being submitted to the jury."

The question thus presented had the careful consideration of the court throughout the trial, for though the quoted language was formally spoken only at the close of the charge, counsel for the defendant had drawn his position to the attention of the court before the hearing opened. And the court's charge was not inadvertently imparted but was formulated after full study of the pertinent authorities.

The challenged language of the charge was—and is—felt by the court fairly and logically to reflect, in application to the evidence before the jury, the reasoning of the Supreme Court in United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867; Colorado National Bank v. Commissioner of Internal Revenue, 305 U.S. 23, 59 S.Ct. 48, 83 L.Ed. 20; and Allen v. Trust Co., 326 U.S. 630, 66 S.Ct. 389. In those cases emphasis is repeatedly placed upon the modifying adjective "dominant" whose thought is also expressed elsewhere in the opinions by the words "compelling", "controlling", "impelling", and "actuating". Those expressions recur frequently, especially in the leading Wells case. The opinions cited seem to this court to cast upon the triers of facts in comparable cases the duty and burden of determining from the whole evidence what consideration dominantly controlled the action of the maker, in a transfer under inquiry. And only an unrealistic appraisal of their purport could suggest that any one of them finds a singleness of purpose completely to have motivated the act challenged in it. The court determined in each case the dominant or controlling motive; but such determination does not exclude, but logically rather supposes, the presence of other but uncontrolling considerations. Human motivation is notoriously complex, only rarely singular and simple. That, in a particular case, the determination of the issue of dominance in motive may be difficult does not relieve the tribunal to which it is submitted of the obligation to make it.

Accordingly, in the quoted part of the charge, the court in the present case allowed the jury, if multiple considerations were within the settlor's mind, to find for the plaintiff only if it should "find from all the evidence either that she did not make the transfer for a purpose springing from the contemplation of death, or that though she may have reflected upon the consideration of death, her transfer was dominantly impelled by another consideration, or by other considerations involving purposes designed to serve her convenience or advantage during life, and would not but for those other considerations have been made." And a finding for the defendant was finally directed if the jury should attribute the transfer to two motives of equal persuasiveness, that is to say, if individual dominance in motive should be indiscernible.

Both on the trial and in its analysis of the present motions, the court has considered Anneke v. Willouts, D.C.Minn., 1 F. Supp. 662; Tait v. Safe Deposit & Trust Co., 4 Cir., 74 F.2d 851; and Farmers Loan & Trust Co. v. Bowers, 2 Cir., 68 F.2d 916. Its recent study has also extended to many other opinions touching, though often remotely, upon the present point. That the three cited cases (as well as certain others) reveal language critical of any evaluation of relative dominance as between multiple considerations or motives is freely recognized. They betray a willingness to dilute the essential content of the Wells case; and that is notably true of Farmers Loan & Trust Co. v. Bowers, supra, which was the first circuit court opinion in the William Waldorf Astor estate tax case. After retrial of that case, and then to a jury, the case was again before the Circuit Court of Appeals. And on that occasion, the court's discussion, in the light of the trial court's charge to

---

is compelling. If the purpose to be effective at her death is to reduce or avoid estate taxes, then Sec. 302(c) is applicable. It is the presence of that state of mind, as an inducing motive, and not the superior weight or strength of another concurring motive, that brings the transfer within the taxing statute."

the jury, is obviously somewhat less vigorous in its negation of the right to evaluate multiple motives and its appraisal of United States v. Wells, supra. Farmers Loan & Trust Co. v. Bowers, 2 Cir., 98 F.2d 794, 796, 797, 798 part (2). Nor is the Tait case squarely determinative of the issue, when one considers its language affirming the trial court's judgment. See Tait v. Safe Deposit & Trust Co., 4 Cir., 74 F.2d 851 at page 854 in association with Safe Deposit Co. v. Tait, D.C.Md., 7 F. Supp. 40. Beyond the foregoing references quotation is unnecessary. And in its mention of the second Astor opinion this court does not even suggest that the court for the second circuit withdrew from its earlier opinion. It rather manifested a tolerance of the contrary view which was quite uncongenial to the writer of its earlier pronouncement.

After careful consideration of the reasons urged in it, the motion for a new trial is also denied and overruled; and the court's further consideration of the case proceeds upon the premise that the issue of the contemplation of death as the dominant motive for the transfer is settled in favor of the plaintiff.

However, the court's final judgment in the action may not be controlled alone by the jury's verdict. That settles only the issue which was submitted to the jury. There remains the equally vital issue whether the transfer in trust, in the light of its complete history was "intended to take effect in possession or enjoyment at or after" the death of the transferor. In 26 U.S.C.A. Int.Rev.Code, § 811(c) inclusion of the value of transferred property in a decedent's gross estate for Federal estate tax purposes is made mandatory if the transfer was made by the decedent, either in contemplation of death, or to take effect in possession or enjoyment at or after his or her death. The disjunctive "or" is used. And the parties to this action recognize that the plaintiff must establish the transfer's immunity from both grounds for inclusion, if it is to prevail.

In deciding a case, Beach v. Busey, 6 Cir., 156 F.2d 496, 497, which has pertinence here only upon the general test of

susceptibility to inclusion, and is otherwise factually distinguishable, Judge Simons, speaking for the court on July 15, 1946, very clearly sets down the pertinent law as finally crystallized in this fashion: "Upon the consideration of many cases involving inclusion of property in the gross estate of a decedent under § 302(c) of the Revenue Act of 1926, as amended, Internal Revenue Code § 811(c), 26 U.S.C.A. Int. Rev.Code, § 811(c), there emerges an interpretation (after some mutations, as in Helvering v. St. Louis Union Trust Co., 296 U.S. 39, 56 S.Ct. 74, 80 L.Ed. 29, 100 A.L.R. 1239, and Becker v. St. Louis Union Trust Co., 296 U.S. 48, 56 S.Ct. 78, 80 L.Ed. 35), that § 302(c) reaches all inter vivos transfers which may be resorted to as a substitute for a will in making dispositions of property operative at death (Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604, 125 A.L.R. 1368); that it sweeps into the gross estate all property, the ultimate possession or enjoyment of which is held in suspense until the moment of the decedent's death, or thereafter (Fidelity-Philadelphia Trust Co. v. Rothensies, 324 U.S. 108, 65 S.Ct. 508, 89 L.Ed. 783, 159 A.L.R. 227); and that the essential element is the decedent's possession of a reversionary interest at the time of his death, notwithstanding such reversionary interest might disappear prior to death. Goldstone v. United States, 325 U.S. 687, 65 S.Ct. 1323, 89 L.Ed. 1871, 159 A.L.R. 1330."

Klein v. United States, 283 U.S. 231, 51 S.Ct. 398, 75 L.Ed. 996, as the basic decision; Commissioner of Internal Revenue v. Estate of Field, 324 U.S. 113, 65 S.Ct. 511, 89 L.Ed. 786, 159 A.L.R. 230; and Allen v. Trust Co., supra, (see especially 326 U.S. 630 at page 636, 66 S.Ct. 389), might readily have been added to the list of cited authorities. A re-examination made, after the erection of the instant trust, by the Supreme Court of its understanding of the provision of 26 U.S. C.A. Int.Rev.Code, § 811(c), for the inclusion within the gross estate of transfers by a decedent intended to take effect in possession or enjoyment at or after the death of the transferor, resulted in the rule observed by Judge Simons. It was

declared generally in Helvering v. Hallock, supra, (which followed Klein v. United States, supra, and overruled Helvering v. St. Louis Union Trust Co., supra, and Becker v. St. Louis Union Trust Co., supra); and it was amplified in Fidelity-Philadelphia Trust Co. v. Rothensies, supra; Commissioner of Internal Revenue v. Estate of Field, supra; Goldstone v. United States, supra; and, to a limited extent, in Allen v. Trust Co., supra.

The present transfer in trust concerned, in the first instance, two parcels of real estate in Des Moines, Iowa. After it was made, the less valuable parcel, a residence property, was sold; and it is not directly involved in this litigation. But the accumulated rentals from the trust property, (so far as they remained undistributed at the decedent's death) largely invested in income producing securities, also constitute a part of the trust. The remaining item of real estate is an undivided fractional share of a valuable and profitable theatre site.

The Trust Agreement made an effective conveyance in trust of the share and title of the settlor in the property to Omaha Trust Company, of Omaha, Nebraska, the original trustee, and vested it with ample powers of management, and also of sale and encumbrance, but with the following limitation upon the power of sale or encumbrance: "provided, however, that no sale, mortgage, conveyance or incumbrance of said property shall be consummated, executed or permitted by the trustee without the written approval of either the Donor *of* [sic] the Donor's nephew, James Madison Shackleford, while either the Donor or her said nephew are living."

Retention and investment and reinvestment, during the settlor's lifetime, of all income from the trust property was authorized and directed; but the trustee's investment or reinvestment in, and sale of, securities in the income account were made subject to similar approval by the settlor or James Madison Shackleford.

Provision was next made for the trustee's payment and transfer of all accumulated moneys and securities in the income account, and transfer of the residence property, or, in the event of its prior sale, its proceeds with the accumulated income therefrom,[6] to James Madison Shackleford, on the settlor's death. Then followed three separate paragraphs in which detailed provisions were severally made for the distribution of the income from the trust property arising after the settlor's death and ultimately of the capital assets of the trust. The course of those distributions is of no present significance, but it may simply be noted that three equal shares of the trust property were segregated for distribution both of principal and of the income to arise after the settlor's death. The income from one of the thirds was made payable first to the settlor's niece, Bertha Shackleford Stokes (now Little) during her lifetime; thereafter to James Madison Shackleford and another niece, Mrs. John J. Marischal, equally during their joint lives and to the survivor of them during the remainder of his or her life; and finally to another niece, Mary Elizabeth Shewmake, for her life. Of that third, the capital was ordered to be distributed, on the lapse of the life interests, to the issue of Mrs. Shewmake, if any, and, in default thereof, to certain other identified relatives. Of the second third, similar disposition was made, save that the primary recipient of income therefrom was Mrs. Marischal, for her life, and the secondary takers of such income were James Madison Shackleford and Mrs. Stokes, but for their lives and the life of the survivor of them only. From the final one-third, the income was made payable, first to James Madison Shackleford during his life, secondly to his wife, Nan Shackleford, for her life, and thirdly to Mrs. Stokes and Mrs. Marischal for their joint lives and to the survivor of them during her remaining life. And the capital of that one-third was made distributable, on the death of the last recip-

---

6 The subsequent sale during the lifetime of the settlor of the residence property, supra, and the delivery to James Madison Shackleford of an amount of money at least equal to the proceeds of that sale seem to eliminate that item from further material consideration by counsel or the court.

ient of income, to certain designated persons.

The ninth numbered paragraph of the Trust Agreement then follows; and it is in this language: "The Donor expressly reserves the power, to be exercised only by herself in writing, to alter, amend, modify or revoke, in whole or in part, the Trust hereby established, without the consent or approval of any of the beneficiaries hereunder, except, only, the Donor's nephew James Madison Shackleford. The Donor expressly surrenders the right to alter, amend, modify or revoke, in whole or in part, the Trust hereby established without the written consent or approval of the said nephew, James Madison Shackleford, expressed in writing to the Trustee, and it is expressly provided that the said James Madison Shackleford shall have the power to approve or prevent any alteration or modification or revocation of the Trust hereby established, but that no other beneficiary hereunder shall have any right or power in this regard whatsoever. It is further expressly provided that the Donor shall have the right to, and she expressly reserves the power to revoke, alter, amend or modify, in whole or in part, the Trust hereby established and to direct the Trustee as to the disposition of the then Trust funds, in case the Donor's nephew James Madison Shackleford should die before the Donor."

Thus, the settlor reserved "the right during the joint lives of herself and James Madison Shackleford, to alter, amend, modify or revoke (the trust) in whole or in part", only with the consent or approval of James Madison Shackleford. And, she further reserved to herself alone "the power to revoke, alter, amend, or modify in whole or in part, the trust hereby established and to direct the Trustee as to the disposition of the then Trust funds, in case the donor's nephew James Madison Shackleford should die before the donor."

The transfer in trust thereby effected, reserving to the settlor alone in the event of the death during her life of James Mad-

ison Shackleford, an absolute power to revoke, alter, amend or modify the Trust Agreement in whole or in part, and specifically to direct the trustee as to the disposition of the then trust funds, retained in the settlor a control which, in its very nature, could terminate only by, and at the moment of, her death. Until that instant it was constantly possible that James Madison Shackleford might die and the settlor, without hindrance from, or concurrence by, or responsibility to, any beneficiary under the trust, or any one else, might alter it in anyway or revoke it altogether.

Without further discussion or repetition of judicial reason which has achieved finality, and upon the authority of the controlling decisions already cited, it is now held that the property of a trust resting alone upon such an instrument must be included in the gross estate of the settlor, on his or her death, for estate tax purposes. And the entire corpus of the trust must be so included, not merely the present worth of an actuarial value of the possibility that the power might, by some event or by a chain of events, become operative. While the plaintiff's complaint, in its first count negatives any validity whatsoever in such inclusion, and in its second count seeks alternatively to limit the inclusion to the present worth of the narrow possibility of the maturing in the settlor of an exclusive power of alteration or revocation, the court does not understand the plaintiff's counsel presently to adhere to either of those positions. But in the face of the averments of the complaint, the court declares that the original contract falls within the tax attaching rule of Klein v. United States, supra; Helvering v. Hallock, supra; Fidelity-Philadelphia Trust Co. v. Rothensies, supra; Commissioner v. Estate of Field, supra; Goldstone v. United States, supra; and of the cited expression in Allen v. Trust Co. supra.[7]

What has just been said goes no farther than the basic Trust Agreement itself. The court now reaches the conten-

---

[7] The contention of the remoteness or unlikelihood of the maturity into a present reality of the possib'lity of reverter to the settlor of a beneficial interest in, or control over, the trust was conclusively rejected in Klein v. United states, supra; Helvering v. Hallock, supra; Fidelity-Philadelphia Trust Co. v. Rothen-

362

tions of the plaintiff in its complaint and in the amendment and supplement thereto, to the effect that subsequent events have wholly absolved the trust property of liability to Federal estate taxation. That reference is to the so-called "Amended Trust Agreement" between the settlor and the Trustee [8] and James Madison Shackleford's "Consent to Alteration of Trust Agreement"[9], both executed under date of

sies, supra; Commissioner v. Estate of Field, supra; and Goldstone v. United States, supra. And implicitly in all of those opinions, explicitly and emphatically in the Fidelity-Philadelphia Trust Co. and Field cases, the rule of inclusion in the gross estate of the value of the whole property as distinguished from an estimated value of the contingently reserved right was vindicated.

Nor is there any virtue in the asserted retroactivity of the attachment of taxability in the present instance. The state of the law at the time of death of the settlor (some presently immaterial factors aside) determines taxability. Besides, despite the subsequently stigmatized Homeric nods of the Supreme Court, the law was not changed. What underwent revision was that court's appraisal of it. And, by way of example, Helvering v. Hallock, supra, became operative upon the estate before the Supreme Court prompting its opinion, although until his death, the settlor and decedent whose estate was involved in it might very well have found security in Helvering v. St. Louis Union Trust Co., and Becker v. St. Louis Union Trust Co. Observe, too, in Allen v. Trust Co., supra, the significant declaration, in its somewhat different context, that: "Retention of the power to amend would have brought the trust property into Mr. Spalding's estate and subjected it to the estate tax lien."

Perhaps it should be made clear that in view of the date of the Trust Agreement, the court does not regard the reservation of the power of alteration or vacation with the consent of James Madison Shackleford during his lifetime as requiring the inclusion of the trust property in the gross estate. See Helvering v. City Bank Farmers Trust Co., 296 U. S. 85, 56 S.Ct. 70, 80 L.Ed. 62; Helvering v. Helmholz, 296 U.S. 93, 56 S.Ct. 68, 80 L.Ed. 76, applying Sec. 302(d) of the Revenue Act of 1926. Nor does the defendant contend that it has such a consequence.

8 "Amended Trust Agreement

Whereas, Margaret Scott Shackleford did on the 9th day of August, 1922, enter into a certain Trust Agreement with the Omaha Trust Company of Omaha, Nebraska, as Trustee, under the terms of which certain real estate in Polk County, Iowa, was to be held and the income therefrom collected and accumulated; and

Whereas, the said Margaret Scott Shackleford reserved unto herself the right to amend and modify and alter or revoke the said Trust Agreement subject to the approval and consent of James Madison Shackleford; and

Whereas, she now desires to amend the said Trust Agreement so that the income from the Trust thereby created shall from the First day of January, 1928, be paid to her for the remainder of her lifetime and to vest in herself the absolute right, upon Thirty Days written notice to the present Trustee, to nominate a different Trust Company as Trustee, which Trust Company may be either in the State of Iowa or the State of Nebraska; and

Whereas, the said James Madison Shackleford has given his written consent and approval thereof to the present trustee;

Now, Therefore, the said Margaret Scott Shackleford hereinafter referred to as the 'Donor', and The Omaha Trust Company, hereinafter sometimes referred to as the 'Trustee', agree that the said original Trust Agreement hereinafter referred to shall be and the same is hereby altered and amended in that the Trustee shall pay to the Donor all net income received from the trust property on or after January 1st, 1928, for and during the remainder of her natural life, and further altered and amended so that from the signing of this instrument the Donor shall have the absolute right to nominate any Trust Company in the State of Iowa or Nebraska as successor Trustee to the present Trust Company upon giving Thirty (30) Days written notice of such intention so to do. In all other respects the parties hereto confirm, ratify and approve the terms of the said original Trust Agreement of August 9th, 1922.

(Sgd.) Margaret Scott Shackleford
Donor.
The Omaha Trust Company, Trustee
By (Sgd.) Daniel J. Monen
Trust Officer.
Attest:
(Sgd.) David F. Davis
Assistant Secretary.

Dated at Omaha, Nebraska, this 25th day of February, 1928."

9 "Consent to Alteration of Trust Agreement

Whereas, Margaret Scott Shackleford did on the 9th day of August, 1922, enter into a certain Trust Agreement with the

February 25, 1928, and to the "Appointment of Successor Trustee", executed by the settlor, and approved by James Madison Shackleford, on March 7, 1929.[10]

In its "Amendment and Supplement to Complaint" the plaintiff contends that "any and all power, right or authority, reserved in, granted to, or in any manner acquired by the settlor, Margaret Scott Shackleford, under the Trust Agreement of August 9, 1922, and amendments thereto, to revoke, alter, amend, or modify said trust, in whole or in part, was fully, completely and finally exercised and exhausted under and by virtue of" the amendment and consent of February 25, 1928 and the Appointment of Successor Trustee of March 7, 1929, and by virtue of the full observance and performance of those later instruments.

Much learning and industry have characterized the briefs in which counsel for the plaintiff argues the many aspects in which

Omaha Trust Company covering certain real estate in Polk County, Iowa; and

Whereas, according to said Agreement the income from such real estate was to be accumulated; and

Whereas, the right to amend or alter the terms of said original Trust Agreement was reserved to the said Margaret Scott Shackleford only upon the condition that James Madison Shackleford should consent to any alterations or amendments; and

Whereas, it is now desired that the income from the said trust estate be paid directly and outright to the said Margaret Scott Shackleford by the Trustee from January 1st, 1928, and it is further desired that the said Donor be given the absolute right to nominate any other Trust Company in the State of Iowa or Nebraska as substitute Trustee, upon giving Thirty (30) Days written notice of her intention so to do to the present Trustee; and

Whereas, the said James Madison Shackleford is willing to consent to such alteration and amendment of the said original Trust Agreement;

Now, Therefore, the undersigned, said James Madison Shackleford does hereby consent to and approve of the request contained and the terms set out in the said amended Trust Agreement wherein the terms provide that the net income from and after January 1st, 1928 shall be by the Trustee paid to the said Margaret Scott Shackleford for the remainder of her life, and wherein she is given the absolute right to nominate any Trust Company in the State of Iowa or Nebraska as successor Trustee upon the delivery of a written notice of her intention so to do to the present Trustee. In all other respects the said Trust Agreement shall remain unaltered and subject to the original provisions.

Dater at Omaha, Nebraska, this 25th day of February, 1928.

Witness:

. (Sgd.) James Madison Shackleford
(Sgd.) David F. Davis"

10 "Appointment of . Successor Trustee

Whereas, Margaret Scott Shackleford did on the 9th day of August, 1922, enter into a certain Trust Agreement with The Omaha Trust Company of Omaha, Nebraska, as Trustee, under the terms of which certain real estate in Polk County, Iowa, is held and the income therefrom collected and accumulated; and

Whereas, Margaret Scott Shackleford reserved unto herself the right to amend said Trust Agreement subject to and with the approval and consent of James Madison Shackleford; and

Whereas, she now desires to amend said Trust Agreement by constituting The Omaha National Bank of Omaha, Nebraska, as Trustee therein and the said James Madison Shackleford has and does hereby consent and approve of such amendment;

Now, Therefore, The Omaha National Bank is hereby made and constituted Trustee under said Trust Agreement above mentioned and all amendments thereto and The Omaha Trust Company is hereby authorized to transfer, deliver, assign and convey unto the said The Omaha National Bank, as substitute Trustee, all securities, funds or real estate now held by it under said Trust and upon such delivery to the said The Omaha National Bank, The Omaha Trust Company will be completely discharged and released from all further responsibility in connection with said Trust.

Executed in triplicate at Omaha, Nebraska this 7 day of March, 1929.

(Sgd.) Margaret Scott Shackleford
Donor.

Approved:
(Sgd.) James M. Shackleford
James Madison Shackleford.

Acceptance

The Omaha National Bank hereby accepts the Trusteeship herein mentioned and agrees to carry out the terms of said Trust Agreement and all amendments thereof with the same protection and indemnification as was granted to said original Trustee.

The Omaha National Bank
by (Sgd.) David F. Davis
David F. Davis,
Assistant Trust Officer"

he considers the claim last stated must be regarded. The court has studied those briefs, the ramifications of their arguments and the authorities tendered in them. But it may not appropriately extend its discussion of them to an extreme length in this memorandum. The Supreme Court's warning in Klein v. United States, supra [283 U.S. 231, 51 S.Ct. 399], against "Multiplying words in respect of the various niceties of the art of conveyancing or the law of contingent and vested remainders", reiterated approvingly in Helvering v. Hallock, supra, cannot support any judicial aversion of vital and determinative issues in a pending action; but it is a persuasive deterrent against the resolution by a trial court of academic perplexities that do not control the course of decision.

So, it seems unnecessary, in practical consequence, to declare with assurance whether Iowa's law must guide the court in its final ruling. It has not been demonstrated that the applicable domestic law of Iowa is essentially to be distinguished from the rules observed generally throughout the nation in comparable litigation. Counsel for the plaintiff, from In re Proestler's Will, 232 Iowa 640, 5 N.W.2d 922, and in some measure from In re Stork's Estate, 233 Iowa 413, 9 N.W.2d 273, concludes, correctly it would appear, that in cases involving the exercise of powers created by will or conveyance, the Iowa courts, in default of a controlling statute, "recognize and enforce the rules and principles of the common law, unless the principle sought to be applied is unsuitable to (Iowa's) own social or political conditions, or not in harmony with the policy and objects of (Iowa's) own peculiar conditions." And no such local unsuitability or discord is pointed out in the present instance. Hence, the plaintiff asserts, and the defendant agrees, that the true intent of the settlor in the transactions under scrutiny is the matter principally to be ascertained and given effect. And that intent must be evaluated with due reference to the precise transaction in which she was engaged.

Upon the general question of the exhaustion [11] of a power by its exercise, there appears to be no doubt but that the full exercise of a power without reservation in apt language of further control operates to exhaust it. So, if under the reserved power, the settlor, with the consent of James Madison Shackleford, had wholly vacated the trust, and thereby recaptured the entire trust property for herself or bestowed it otherwise, the power would have been fully exhausted by its plenary exercise. No controversy between the parties is presented thus far. But not every action in the exercise of a power, whether reserved or granted, results in its exhaustion. The text in 49 Corpus Juris 1302, Title Powers, Section 140, states the rule thus: "A power may be exercised from time to time by partial and successive executions, to suit convenience and promote advantage, as exigencies arise, or as expediency may suggest, and a partial exercise of a power is not invalid because it does not exhaust the power. So a power over a fee may be executed at one time to pass a life estate or other partial interest and at another to pass the remainder, or to pass at one time a part of the property in fee and afterward the balance."

Cited by the defendant upon the submission of this case and now accepted by the court, are also the following quotations respectively from Kent and Sugden: "Another rule is, that powers of revocation, and appointment and sale, need not be executed to the full extent of them at once; they may be exercised at different times over different parts of the estate, or over the whole estate, if not to the whole extent of the power." 4 Kent's Commentaries (14th Ed.) p. 334. "Powers of appointment and revocation need not be executed to the utmost extent at once, but may be executed at different times over different parts of the estate, or over the whole estate, but not to the full extent of the power. Digges's case, is an authority, that under a power of revocation the uses of part of the land may be revoked at one time, and of part of another, and so of the residue, until the uses of all the

---

[11] The court accepts as valid the plaintiff's distinction between the "exhaustion" of a power resulting from its adequate exercise, and the broader "extinguishment" of a power, comprehending "exhaustion" and also termination by many other means, including express surrender, non-user in some circumstances, waiver, contract, and the like.

land are revoked. So where a man has a general power of appointment, he may execute it at several times, and appoint an estate for life at one time, and the fee at another time. And the same of a power of revocation. So powers of jointuring, &c., may in like manner be executed at different times, provided that the party do not in all the executions exceed the limits of the power." 1 Sugden on Powers, pp. 391, 392.

The inference of the exhaustion of a power by its exercise obviously does not arise in an instance where the instrument creating or reserving the power specifies a variety of distinct actions or objectives within the scope of the power, and its only exercise is in respect of a partial, distinct and narrow phase of those actions or objectives.

Recurring, now, to the Trust Agreement before the court, the diversity of powers reserved to the settlor is immediately apparent. First, so long as James Madison Shackleford should live, the settlor reserved to herself the right or power, but only with his written consent or approval (a) to alter, amend, or modify, or (b) to revoke the trust, in whole or in part. Secondly, in case of the death of James Madison Shackleford during her life, she reserved to herself alone, after his death and for the remainder of her life, the right or power (a) to revoke, or (b) to alter, amend, or modify the trust in whole or in part and distinctly emphasized that this reservation should include the power "to direct the trustee as to the disposition of the then trust funds". The sweeping and separable quality of that reserved authority in its various aspects cannot be disregarded.

The modification of February 25, 1928 was very narrow in scope. It accomplished just two things. It, first, diverted from James Madison Shackleford to the settlor the net income which should be received from the trust property from January 1, 1928 until the settlor's death, without disturbing James Madison Shackleford's right, on the settlor's death, to receive the income which had accumulated from the date of the erection of the trust until January 1, 1928. Secondly, it vested in the settlor the absolute right to designate any trust company in Iowa or Nebraska as successor trustee in succession to the original trustee.

The amendment did not otherwise affect or alter the basic trust instrument or any rights thereunder of any party in either the capital of the trust or the income therefrom. By way of recollection, it left wholly untouched the existing plan for distribution (a) of the income from August 9, 1922 to January 1, 1928; (b) of the income from the death of the settlor until the time or times limited in the original trust instrument for final distribution of the several parts of the corpus; and (c) of the capital assets of the trust.

Even if nothing further appeared in the Amended Trust Agreement of February 25, 1928, it could not logically or reasonably be argued that the amendment then made despoiled the original trust instrument of its reservation to the settlor of the several rights to alter or vacate, or fixed unalterably, the yet unmodified interests under the Trust Agreement. Nothing in its language could lead to that result and it will not be imported into the settlor's act by legal refinement.

But the amendment went further; and, as if to remove any possible question upon the point, declared: "In all other respects the parties hereto confirm, ratify and approve the terms of said original Trust Agreement of August 9th, 1922." One of those "terms", very surely, was the reservation in paragraph IX of the Trust Agreement of the rights to alter or revoke already quoted and analyzed. To this court it seems unquestionable that the language quoted in this paragraph not only did not terminate but actually republished and expressly preserved those rights.

The plaintiff, however, argues that the effect of the language so quoted from the Amended Trust Agreement was to fix unalterably thereafter the remaining beneficial interests as they were created under the original Trust Agreement and to place them beyond the reach of any future modification or revocation by the settlor, either with the consent of James Madison Shackleford during his lifetime, or without such consent after his death, if he should predecease the settlor. It urges that understanding especially when the Amended Trust Agreement is interpreted in association with the concurrent consent to it by James Madison

Shackleford. That Consent, after referring and expressly consenting to the amendment then being made, concludes with the sentence: "In all other respects the said Trust Agreement shall remain unaltered and subject to the original provisions." The court has not failed to note, or carefully to consider, the verbal disparity between the quotations from the Amended Trust Agreement and from the Consent; but is persuaded that it does not reflect a diversity in thought or purpose. Each of the two sentences, in language slightly different from the other, expressly preserves intact, unaltered and unaffected by the transaction of February 25, 1928, all of the then unmodified provisions of the original Trust Agreement, including the reserved powers of alteration or revocation. It may even be suggested that of the two expressions the sentence quoted from the Consent is the more explicit, for it recognizes as unaltered, the original Trust Agreement, subject to the original provisions. And, again, most vital among those original provisions was the reserved power of alteration or revocation. Nowhere in the instruments executed on February 25, 1928 can the court perceive the slightest indication of any intent either of the settlor or of James Madison Shackleford, or of both of them, to terminate or alter in any manner that reserved power.

So far, the court has endeavored to appraise the settlor's intent entirely from the critical written instrument. It is in order, however, to add at this point that no testimony presented on the trial disclosed any intent on her part to abandon her right of alteration or revocation. In fact, the very evidence by which the plaintiff defeated the defendant's contention that the trust was erected in contemplation of death repelled the supposition that the self centered, irascible and willful settlor could reasonably be expected to surrender or minimize her reserved power over the course of disposition of the trust property. She kept constantly and alertly in touch with the trust until her death.

It is suggested that the abandonment of the right of the settlor to make further change in the disposition of the benefits of the trust was "the only inducement, or consideration or benefit moving to" James Madison Shackleford for his consent to the amendment of February 25, 1928, which was obviously to his disadvantage, if the trust property alone be regarded. To that argument, at least two answers are apparent. No consideration, strictly understood, no inducement or benefit was required for such consent. The right to consent or disapprove of change or vacation was reposed in him, to be exercised by him without reward or even capriciously. And the argument overlooks another significant fact. The assets of this trust were not the settlor's only property. She was well to do apart from them. James Madison Shackleford was one of her probable heirs, the only one living in the vicinity of her residence. He had, therefore, a powerfully persuasive motive to cooperate with her in any reasonable change in the trust arrangement. The court is satisfied that the "surrounding facts and circumstances" in no wise support the argument for the existence of an intent to exhaust, and thus to extinguish the settlor's right to change or revoke.

The suggestion that (in the event of the prior death of James Madison Shackleford) the settlor's attempted modification thereafter of the trust [12] "for the purpose of obtaining a benefit to herself" would be invalid as a fraudulent revocation is without merit. No beneficiary acquired under the Trust Agreement any right whatsoever that was not, in the very instrument of its creation, made expressly subject to the settlor's right of alteration or revocation to be exercised in the manner prescribed in that instrument. And the fact that the holder of the power in the present case was the settlor herself distinguishes her position from that of a mere "donee" of a power within the citation made by the plaintiff. 49 C.J. 1307. The trust property was taken from her own substance and it was peculiarly her right to prescribe the conditions of

---

[12] It is true that in stating his position upon this point counsel refers to the modification of the "amendment" rather than of the "trust". But the court rejects the inference that the perseverance and exercise of the right of alteration or revocation would involve either amendment of, or disregard for, the Amended Trust Agreement.

its bestowal upon others, even if those conditions included the contingency of its own recapture by her.

Estoppel is suggested by the plaintiff to have resulted from the amendment and consent of February 25, 1928. The court can perceive no single ground or factor adequate for the raising of an estoppel resulting in the termination of the power of alteration or vacation. Not one inequitable act on the settlor's part is identified in the record or betrayed in the instruments of amendment themselves; nor is any equity in behalf of a beneficiary raised which could permanently thwart her potential alteration or revocation of the trust.

But it is earnestly argued in a reply brief presented by the plaintiff that James Madison Shackleford alone extinguished the power of change or revocation originally reserved in the settlor. That argument is ingenious and interesting; but it is not valid. It proceeds in this manner. (a) In paragraph IX of the original Trust Agreement appears this clause: "And it is expressly provided that the said James Madison Shackleford shall have the power to (approve or) prevent any alteration or modification or revocation of the Trust hereby established." (b) In his consent on February 25, 1928 he declared that: "In all other respects the said Trust Agreement shall remain unaltered and subject to the original provisions." (c) Therefore, and thereby, he terminated and extinguished all future power of change or revocation, as well after his death as during his lifetime.

That reasoning falters in its every step. To begin with, his quoted power to prevent alteration, modification or revocation must remain in its proper context. And that context deals solely with the imposition during his lifetime only of his consent as a limitation upon the settlor's right of alteration, modification or revocation. The language just quoted from paragraph IX is also set down by way of antithesis to the clause which immediately follows it, that is: "but that no other beneficiary hereunder shall have any right or power in this regard whatsoever." Even as to amendments to be made during his lifetime, his power was limited to consenting or refusing to consent.

It certainly may not be thought that he could, solely on his own motion, by any act or instrument whatsoever, have placed the trust beyond the power of the settlor thereafter, but during his lifetime to change or revoke, if only he should give his consent at the time of a subsequent proposed change or revocation. And the language simply has no pertinence whatsoever to the power reserved to the settlor, alone and without any one's consent, to act decisively in the event of his death while she was still living. Adequate discussion has already been had of the inadequacy of the language quoted from the Consent to accomplish the result claimed for it.

■ Of the change of trustee made on March 7, 1929 it need only be observed that it can have no possible consequence upon the reserved right of alteration or revocation. It was within the express contemplation of the amendment of February 25, 1928, and was a recognition of the reorganization of the trust business of Omaha National Bank (the designated successor-trustee). That business had theretofore been conducted by Omaha Trust Company, a corporation, affiliated with the bank. The instrument effecting the change made no reference to the power, was not even remotely connected with it, and may not be allowed to "hit mark the archer never meant".

The foregoing discussion has acquired considerable length. However, the court is persuaded that counsel are entitled to a reasonably complete statement of the considerations which have led to its conclusion. And as that conclusion deals with the important factor of intent, some of the more salient marks of intent have been discussed. It has to be said by way of conclusion that in the court's estimation nothing in the acts and transactions which the record discloses to have occurred after the execution of the original Trust Agreement, either alters, impairs or extinguishes the power of the settlor to alter or revoke the trust without the consent of any person, in the event of the death of James Madison Shackleford during her life. And the court has to revert to its conclusion that that power requires the inclusion of the value of the entire trust prop-

erty in the gross estate of the settlor-decedent for federal estate tax purposes. (See authorities cited above).

Judgment is, therefore, being entered for the defendant, dismissing this action and the plaintiff's complaint at its costs.